[Cite as *State v. Evans*, 2026-Ohio-1237.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS.  CA2025-07-058<br>CA2025-08-068 |
| vs. | : | OPINION AND<br>JUDGMENT ENTRY<br>4/6/2026 |
| RONDELL LAMONT EVANS, | : | |
| Appellant, | : | |
| and | : | |
| DEVONTRAE SEVON WILLIAMS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case Nos. 24CR42127; 24CR42128

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant, Rondell Lamont Evans.

Christopher Travis, for appellant, Devontrae Sevon Williams.

## **O P I N I O N**

**M. POWELL, J.**

{¶ 1}   Defendants, Rondell Evans and Devontrae Williams, appeal from their convictions in the Warren County Court of Common Pleas for robbery, kidnapping, grand

theft, and possession of criminal tools. For the reasons that follow, we reverse in part and affirm the rest.

## I. Factual and Procedural Background

### A. Factual Background

{¶ 2} On Sunday, October 20, 2024, shortly before 4:15 p.m., two masked men entered the Verizon store on Towne Boulevard in Middletown, Ohio. The store was open for business at the time. Jamarcus Crosby, the store manager, was present, along with sales representative Alex Phifer, other employees, and customers. By the time Crosby realized what was happening, it was too late to lock the door.

{¶ 3} One of the men, later identified as Dazion Strattman, wore a black hooded sweatshirt and black gloves. The other, later identified as appellant Rondell Evans, wore a light gray hooded sweatshirt, light-colored blue jeans with a black tag hanging from the back pocket, and teal-colored surgical gloves. Both men wore masks over their faces and had their hoods pulled up. Both kept their hands in their pockets, which led Crosby to believe they were armed with guns.

{¶ 4} Strattman, the man in black, approached Crosby with his hand still in his pocket and said, "you know what time it is?" When Crosby responded, "what you talking about?", Strattman replied, "you heard me, you know what time it is. Where the phones at?" "[W]e're not here to play." Meanwhile, Evans walked past Crosby without saying a word and went directly to the back of the store toward the inventory room where the phones were kept. Strattman then ordered Crosby to "take me to the phones."

{¶ 5} Crosby did as he was told. He left his position on the sales floor and led the two men to the inventory room. Crosby walked through a separate cubby area, a "quote room," and an employee area before reaching the inventory room. Evans was already

waiting at the inventory-room door by the time Crosby and Strattman arrived. Crosby, who had the key to the locked inventory room, unlocked the door and allowed the two men inside. As he entered the inventory room, Crosby pressed an alarm button next to the door, which secretly alerted the police to the robbery in progress.

{¶ 6} Inside the inventory room, Strattman handed Crosby a trash bag that Strattman had brought with him and instructed Crosby to "put the phones in the bag." Crosby complied. Evans, meanwhile, was throwing phones into a second trash bag that he had removed from his own pocket. When Crosby was not putting the right phones in the bag, Strattman "got pissed off" and snatched the bag from him. In addition to the phones, Crosby placed into the bag a 3SI tracker phone, a device designed to look like a phone box but containing a GPS tracker. When the two men had finished taking what they wanted, they fled through an exit door near the inventory room.

{¶ 7} While Crosby was in the inventory room with Strattman and Evans, Phifer instructed the customers to leave the store, exited the building with another employee, and called 9-1-1. Phifer told the dispatcher that the store was being robbed and described the two perpetrators.

{¶ 8} When the two men departed the store with the stolen merchandise, the tracker phone sent an alert to Christopher Walter at Verizon corporate security, local law enforcement, and the 3SI tracking company. Walter reviewed the store's security video, confirmed that a robbery had occurred, and began providing the police with real-time GPS updates on the tracker's location. Walter also provided a complete inventory of the 38 items that had been stolen, with a total value of roughly $31,420.

{¶ 9} Walter further reviewed the store's exterior security video and identified the suspect vehicle as a white four-door sedan that had been parked in a lot behind the store.

The video showed two suspects exiting that vehicle approximately two minutes before they entered the store, walking to the door with their hands in their pockets the entire time. After the robbery, the sedan pulled closer to the store, picked up the two men as they fled, and drove away.

{¶ 10} The GPS tracker followed the stolen phones as they traveled south from Middletown, through several routes, to Star Wireless, a wireless-phone retailer in Green Township, Cincinnati, arriving at approximately 5:05 p.m. Middletown Police Officer Brian Singleton arrived at the Verizon store at 4:17 p.m. and obtained descriptions of the stolen property and the suspects from the store employees. A Flock automated license plate reader had captured a white four-door Pontiac with license plate KIU 9856 in the westbound lane of S.R. 122 near Towne Boulevard at 4:00 p.m. and again in the eastbound lane at 4:19 p.m.

{¶ 11} At approximately 5:00 p.m., Green Township Police Officers Tyler Bridwell and Ashley Roettker responded to the Star Wireless store. Upon arrival, Officer Roettker observed a white sedan parked in front of the store. The officers entered the store and observed five individuals inside, three of whom were in a group. One of the three was sitting on a counter wearing a backpack, and two trash bags containing white boxes were visible on the counter. Officer Bridwell spoke with the Star Wireless store manager, who confirmed that the group had been attempting to sell phones and that the backpack was connected to the transaction.

{¶ 12} The three suspects began to leave the store. The officers ordered them to stop, and a foot pursuit ensued. Officers ultimately apprehended Strattman, who was wearing the backpack, along with Evans and appellant Devontrae Williams. Evans was still wearing the blue jeans with a black tag hanging from the right rear pocket that

matched the clothing captured on the Verizon store's security video.

{¶ 13} Detective Singleton confirmed that the white sedan at Star Wireless was a Pontiac G6 matching the vehicle captured by the Flock camera in Middletown around the time of the robbery. The vehicle was registered to a woman in Cincinnati, whom Williams later identified as the mother of his child.

{¶ 14} Middletown Police Detective Connor Kirby conducted the robbery investigation. Security video from Star Wireless showed Williams as the driver of the white Pontiac, Evans exiting the front passenger side, and Strattman exiting the rear passenger side. Detective Kirby interviewed Williams at the Middletown police station. Williams told the detective that four people were in the vehicle; that Strattman and his companion had discussed what Williams called "a play," or some sort of illegal activity; that they had negotiated to pay Williams between $60 and $90 to drive them; and that they drove to Middletown and parked near the Verizon store. Williams told Detective Kirby that he and Evans stayed in the vehicle while Strattman and another individual exited, and that Strattman later returned running with a heavy bag, at which point they drove away. Williams confirmed that he knew a crime had been committed at the Verizon store when the others returned to the vehicle. He described the seating arrangement in the car as himself in the driver's seat, Evans in the front passenger seat, Strattman in the rear on the driver's side, and an unidentified individual in the rear on the passenger side.

{¶ 15} The investigation revealed no evidence of a fourth person involved in the robbery. Video from the Verizon store's rear exterior camera showed two individuals exiting the car before the robbery and two individuals returning to the car after the robbery. The individual in the gray hoodie was captured on video getting into the front passenger seat, the same position Williams had placed Evans in the car and the same position Evans

occupied when the vehicle arrived at Star Wireless.

{¶ 16} A search of Strattman's backpack revealed seven cell phones identified as items stolen from the Middletown Verizon store, the tracker phone, a box for AirPods, an empty Apple product box, and a black nylon ski mask with a white Nike logo. A search of the white Pontiac recovered, from the rear driver's side where Strattman had been seated, a black trash bag containing two-toned jeans, black nylon mesh shoes, and a black hoodie, as well as a pair of fleece gloves. From the front passenger side where Evans had been seated, investigators recovered teal-colored surgical gloves that had been turned inside out, a black mask, and a gray Nike hoodie. A wallet in the glove compartment contained Evans's Ohio identification card, credit cards, and a birth certificate.

{¶ 17} The clothing and accessories recovered from the vehicle matched the items worn by the two perpetrators in the Verizon security video. The pattern on the black trash bag in the rear of the vehicle was the same as the trash bag seen in Evans's hands inside the Verizon inventory room and later on the counter at Star Wireless. DNA testing of the face mask and black gloves recovered from the rear of the vehicle matched Strattman. DNA testing of the face mask and teal surgical gloves from the front passenger area matched Evans. Cellphone data extracted from Evans's and Williams's phones placed them in the area of the Verizon store at the time of the robbery and in the area of Star Wireless at the time of their arrest.

### B. Procedural History

{¶ 18} On November 12, 2024, a Warren County Grand Jury returned separate indictments against Evans, Williams, and their codefendant Strattman. Each was charged with aggravated robbery in violation of R.C. 2911.01, a first-degree felony; kidnapping in

violation of R.C. 2905.01, a first-degree felony; grand theft in violation of R.C. 2913.02, a fourth-degree felony; and possession of criminal tools in violation of R.C. 2923.24, a fifth-degree felony. All three defendants pleaded not guilty.

{¶ 19} The cases proceeded to a joint bench trial on May 12 and 13, 2025. After considering the evidence, the trial court found each defendant guilty of the lesser-included offense of robbery under R.C. 2911.02(A)(2), a second-degree felony, rather than the charged aggravated robbery. The court also found each defendant guilty of kidnapping as a second-degree felony, having found that the victim was released in a safe place unharmed, as well as grand theft and possession of criminal tools as charged in the indictments.

{¶ 20} Williams was sentenced on July 21, 2025. The trial court merged his grand-theft conviction with the robbery conviction, and the State elected to proceed on the robbery. The court imposed a minimum prison term of two years to a maximum indefinite term of three years for robbery, a definite two-year prison term for kidnapping, and six months for possession of criminal tools. The court ordered the kidnapping sentence to run consecutively to the robbery sentence and the criminal-tools sentence to run concurrently, for a total aggregate sentence of a minimum of four years to a maximum of five years. Williams's counsel had argued for merger of the kidnapping and robbery offenses both at the close of trial and at sentencing. The trial court rejected those arguments.

{¶ 21} Evans was sentenced on July 22, 2025. The trial court likewise merged Evans's grand-theft conviction with the robbery conviction. The court imposed a minimum indefinite prison term of four years to a maximum of six years for robbery, a definite two-year prison term for kidnapping, and twelve months for possession of criminal tools. The

court ordered the kidnapping sentence to run consecutively to the robbery sentence and the criminal-tools sentence to run concurrently, for a total aggregate sentence of a minimum of six years to a maximum of eight years. Evans's counsel moved at sentencing to merge the kidnapping conviction with the robbery conviction. The trial court denied the motion.

{¶ 22} At Evans's sentencing hearing, the trial court stated that "consecutive sentences are necessary in order to punish the offender and protect the public from future crime" and that "they're not disproportionate to the conduct or danger posed by the defendant." The court also remarked that it had "taken into consideration his record as well." The trial court's sentencing entry included findings under both R.C. 2929.14(C)(4)(b) and (c). Evans's presentence investigation and the sentencing hearing reflected that Evans had a criminal history including juvenile robbery offenses, adult convictions for attempted robbery, theft-related offenses, and drug trafficking, prior prison terms in Ohio and Kentucky, a history of violating probation, and conduct violations while incarcerated.

{¶ 23} The trial court's sentencing entry for Evans stated that he was subject to a mandatory period of postrelease control of up to three years but not less than eighteen months, that the Adult Parole Authority would administer postrelease control under R.C. 2967.28, and that violations would subject him to consequences including a prison term of up to one-half of his originally imposed sentence. But the trial court made no mention of postrelease control at the sentencing hearing itself. The court did not advise Evans at the hearing whether postrelease control was mandatory or discretionary, the duration of the postrelease-control period, or the consequences he would face for violating its conditions.

{¶ 24} Evans and Williams separately appealed. This court has sua sponte consolidated the appeals for review.

## II. Analysis

{¶ 25} Evans raises four assignments of error, challenging the sufficiency and weight of the evidence supporting his kidnapping conviction, the trial court's failure to merge his kidnapping and possession-of-criminal-tools convictions with the robbery conviction, the trial court's failure to properly advise him of postrelease control at sentencing, and the trial court's failure to make the required findings before imposing consecutive sentences. Williams raises a single assignment of error, contending that the trial court erred in failing to merge his kidnapping and possession-of-criminal-tools convictions with the robbery conviction.

## A. Evidentiary Challenges

{¶ 26} Evans's first assignment of error alleges:

> EVANS' CONVICTION FOR KIDNAPPING IS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE OR LEGALLY SUFFICIENT EVIDENCE.

{¶ 27} In his first assignment of error, Evans contends that his conviction for kidnapping under R.C. 2905.01(A)(2) is supported by neither sufficient evidence nor the manifest weight of the evidence. His argument has two components. First, he asserts that Strattman, not Evans, was the one who ordered Crosby from the sales floor to the inventory room, and that the evidence therefore fails to establish that Evans personally committed any act of removal or restraint. Second, he points to Crosby's testimony that he felt free to step out of the inventory room after unlocking the door, which Evans contends undermines the State's theory of restraint. We address each contention in turn.

**1. Standards of Review**

{¶ 28} The standards governing sufficiency and manifest-weight challenges are well settled. A sufficiency inquiry asks "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), at paragraph two of the syllabus. In conducting this analysis, an appellate court does not weigh credibility or resolve factual disputes; it asks only whether the State has met a minimum threshold of evidentiary adequacy. We will not disturb the verdict "unless [we] find[] that reasonable minds could not reach the conclusion reached by the trier of facts." *Id.* at 273.

{¶ 29} Manifest weight presents a different question. Here, the appellate court must "'review[] the entire record, weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.). But the discretionary power to grant a new trial "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

**2. The Elements of Kidnapping**

{¶ 30} Evans was convicted of kidnapping in violation of R.C. 2905.01(A)(2), which provides that "[n]o person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person . . . [t]o facilitate the commission of any felony or flight thereafter." The statute is written in the

- 10 -

disjunctive. To sustain a conviction, the State need only prove that the defendant, by force, threat, or deception, either removed the victim from the place where the victim was found or restrained the victim's liberty, for the purpose of facilitating the commission of a felony. *See State v. Logan*, 60 Ohio St.2d 126, 130 (1979) ("It is clear from the plain language of the statute that no movement is required to constitute the offense of kidnapping; restraint of the victim by force, threat, or deception is sufficient.").

### 3. Complicity Resolves Evans's Principal Argument

{¶ 31} Evans's central contention is that Strattman, rather than Evans, was the one who ordered Crosby to leave the sales floor and lead them to the inventory room. Evans notes that Crosby testified he left the customer-service desk because Strattman told him to; that an eyewitness heard Strattman, not Evans, give the order; and that Evans walked past Crosby without saying a word and went directly to the inventory room. Evans asks us to conclude that because Strattman gave the verbal commands, the evidence cannot support Evans's kidnapping conviction.

{¶ 32} The argument misapprehends a foundational principle of criminal law. Evans was tried and convicted not solely as a principal offender but under the theory that he and Strattman acted together as accomplices in a coordinated robbery of the Verizon store. Under Ohio's complicity statute, R.C. 2923.03, the law treats an accomplice "as though the accomplice had committed every act of the underlying principal offense." *State v. Hurse*, 2015-Ohio-2656, ¶ 11 (10th Dist.). The accomplice "may, therefore, be charged under the statute defining the principal offense, and the law will impute the elements of the offense committed by the principal actor to the accomplice as an aider and abettor, as if the accomplice had committed those acts." *Id.* A person aids or abets another when he "'supports, assists, encourages, cooperates with, advises or incites the principal in the

commission of the crime and shares that criminal intent of the principal.'" *Id.* at ¶ 18, quoting *State v. Lett*, 2005-Ohio-1308, ¶ 28 (8th Dist.). Such intent may be inferred from the circumstances surrounding the crime, including "presence, companionship, and conduct before and after the offense." *Id.*

{¶ 33} The record here paints a detailed picture of coordinated criminal activity. Evans and Strattman arrived at the Verizon store together, both wearing masks, gloves, and hooded sweatshirts. Both men kept their hands in their pockets in a manner that led Crosby to believe they were armed. While Strattman approached Crosby and said, "you know what time it is" and "we're not here to play," Evans walked directly to the back of the store toward the inventory room, the very place where the phones were kept. Evans was already at the inventory-room door, waiting, by the time Strattman ordered Crosby to "take me to the phones." Once inside the inventory room, Strattman handed Crosby a trash bag and ordered him to fill it with phones, while Evans assisted in the operation. Evans carried his own trash bag and gloves. After the robbery, the two men fled together to the same vehicle, where they were apprehended. DNA evidence matched Evans to the face mask and surgical gloves recovered from the vehicle.

{¶ 34} From this evidence, a reasonable person could readily infer that Evans and Strattman shared a common criminal purpose, that they planned the robbery together, and that each played a coordinated role in its execution. The fact that Strattman happened to be the one who verbally ordered Crosby to the inventory room does not insulate Evans from liability for the kidnapping any more than it would insulate a getaway driver from liability for a bank robbery committed by his partner inside the bank. Under Ohio law, Strattman's acts of ordering Crosby to leave the sales floor and accompany them to the inventory room are imputed to Evans. Evans's sufficiency argument on this ground

therefore fails.

{¶ 35} And the manifest-weight analysis leads to the same conclusion. There is no competing theory of the evidence that would suggest Evans was an innocent bystander or an unknowing participant. He arrived with Strattman. He was masked and gloved. He went directly to the inventory room as though he knew exactly where the phones were. He waited at the locked door. He participated in bagging the stolen merchandise. The trier of fact did not lose its way in concluding that Evans was a willing and active participant in every phase of this crime, including the removal of Crosby from the sales floor.

### 4. The Evidence Also Supports Both Removal and Restraint

{¶ 36} Evans argues that even if his liability as an accomplice is established, Crosby's testimony that he "felt that he was free to step out of the inventory room" after he unlocked the door negates the restraint element. He also emphasizes that Crosby directed one of the men to hold the door open so they would not get locked inside, and the men complied. Evans characterizes this as evidence "that the victim felt free to leave the room and told his alleged kidnappers to keep the door open."

{¶ 37} This argument ultimately asks us to view a sliver of testimony in isolation from the totality of the evidence. The kidnapping statute, R.C. 2905.01(A)(2), can be satisfied by proof of either removal or restraint, and the record supports both.

{¶ 38} As to removal, the evidence is effectively undisputed. Crosby was standing at a table on the sales floor when the two masked men entered the store. Strattman, who appeared to be armed, told Crosby, "we're not here to play," and ordered him to "take me to the phones." Acting under the implicit threat of force, Crosby left his position on the sales floor, walked through a cubby area, a "quote room," and an employee area, then

unlocked and entered the inventory room. This is textbook removal under R.C. 2905.01(A)(2): Crosby was moved, by threat, from the place where he was found, to facilitate the commission of a felony. No more is required.

{¶ 39} As to restraint, we agree that Crosby's testimony about feeling "free to step out" creates some tension in the record. But this testimony must be weighed against the objective circumstances that the trial court was entitled to assess. Crosby moved to the back of the store at the direction of two men he believed to be armed. Once inside the inventory room, Strattman handed him a trash bag and ordered him to fill it with phones. When Crosby was not putting the right phones in the bag, Strattman "got pissed off" and snatched the bag from him. Throughout this episode, Crosby was separated from the other employees, who had remained on the sales floor, and was alone in a back room with two masked, apparently armed men. A reasonable trier of fact could conclude that, whatever Crosby's subjective belief about his freedom to leave at one particular moment, the totality of the circumstances established that his liberty was in fact restrained by force and threat for the purpose of facilitating the robbery. The victim's momentary subjective impression does not override what the objective evidence reveals about the coercive nature of the encounter.

{¶ 40} In any event, because the statute is satisfied by proof of removal alone, and the evidence of removal is overwhelming, Evans's conviction stands even setting aside the restraint question entirely.

### 5. Conclusion on the First Assignment of Error

{¶ 41} Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that Evans, acting as an accomplice to Strattman, removed Crosby from the sales floor by threat and transported

him to the inventory room to facilitate the robbery of the Verizon store. The evidence is likewise sufficient to support a finding that Crosby's liberty was restrained during the incident. The trial court, sitting as trier of fact, did not lose its way in reaching this conclusion. Evans's kidnapping conviction is supported by both sufficient evidence and the manifest weight of the evidence.

{¶ 42} Evans's first assignment of error is overruled.

### B. Merger

{¶ 43} Evans's second assignment of error alleges:

THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE EVANS' CONVICTIONS FOR KIDNAPPING AND POSSESSION OF CRIMINAL TOOLS WITH HIS ROBBERY CONVICTION.

{¶ 44} Williams's sole assignment of error alleges:

THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE [WILLIAMS'S] CONVICTIONS FOR KIDNAPPING AND POSSESSION OF CRIMINAL TOOLS WITH HIS ROBBERY CONVICTION.

{¶ 45} These two assignments of error contend that the trial court erred by failing to merge the kidnapping and possession-of-criminal-tools convictions with the robbery conviction. Because the merger question presented is identical for both appellants, we address them together. We consider the kidnapping-robbery merger question and the criminal-tools-robbery merger question in turn.

### 1. Standard of Review and Governing Law

{¶ 46} Whether offenses are allied offenses of similar import subject to merger under R.C. 2941.25 is a question of law that we review de novo. *State v. Williams*, 2012-Ohio-5699, ¶ 1.

{¶ 47} R.C. 2941.25 codifies the constitutional double-jeopardy protections against

- 15 -

multiple punishments for the same criminal conduct. *State v. Ruff*, 2015-Ohio-995, ¶ 10-13. Division (A) of that statute provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." Division (B) permits conviction on all counts where the offenses are of dissimilar import, were committed separately, or were committed with a separate animus.

**{¶ 48}** In *Ruff*, the Ohio Supreme Court clarified the analytical framework. A court must "take into account the conduct of the defendant" and ask: "how were the offenses committed?" *Ruff* at ¶ 25. If any of the following is true, the offenses do not merge and the defendant may be convicted and sentenced on each: "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id*.

### 2. The Kidnapping and Robbery Offenses Are Allied Offenses of Similar Import That Should Have Merged

**{¶ 49}** Where the allied-offense question involves kidnapping committed during the course of another crime, Ohio courts apply the guidelines articulated in *State v. Logan*, 60 Ohio St.2d 126 (1979). Although *Logan* predates *Ruff*, courts continue to apply its framework to determine whether offenses were committed with a separate animus under the third prong of the *Ruff* test. *State v. Killingsworth*, 2020-Ohio-724, ¶ 15, fn. 3 (3d Dist.); *State v. Lundy*, 2017-Ohio-9155, ¶ 26 (8th Dist.). Under *Logan*,

> Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense,

there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus. A separate animus also exists "[w]here the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *Id.*

{¶ 50} The Ohio Supreme Court has observed that "implicit within every robbery (and aggravated robbery) is a kidnapping," *State v. Jenkins*, 15 Ohio St.3d 164, 198, fn. 29 (1984), because "when a person commits the crime of robbery, he must, by the very nature of the crime, restrain the victim for a sufficient amount of time to complete the robbery," *Logan* at 131. Thus, while robbery and kidnapping can in some circumstances be committed with separate animus, it is "not uncommon for courts to merge robbery and kidnapping convictions for purposes of sentencing." *Killingsworth* at ¶ 17.

{¶ 51} The State advances two principal arguments against merger. First, it contends that the restraint of Crosby exceeded what was merely incidental to the robbery because, after Crosby opened the door to the inventory room, the defendants did not release him. Instead, Strattman handed Crosby a trash bag and ordered him to fill it with phones. The State reasons that once Crosby provided access to the inventory room, the robbery was essentially complete, and everything that followed was a prolongation of the restraint independent of the robbery.

{¶ 52} Second, the State argues that Crosby's movement to, and confinement in, the inventory room exposed him to a substantial increase in the risk of harm separate and apart from the robbery. Unlike other employees on the sales floor who were free to leave the store once the perpetrators moved to the back, Crosby was isolated in the inventory room with two men he believed to be armed. When Crosby placed the wrong phones in

the bag, Strattman got angry and snatched the bag from him. The State characterizes this as evidence that every additional second of Crosby's confinement increased his risk of physical violence. The State also emphasizes the distance of the movement itself. To get from the sales floor to the inventory room, Crosby had to walk through a separate cubby area, a "quote room," and an employee area. The State contends this constitutes the kind of substantial movement that, under *Logan*, demonstrates a significance independent of the robbery.

### a. The Restraint Was Incidental to the Robbery

{¶ 53} Begin with the State's contention that the robbery was "complete" once Crosby opened the door. The State's theory slices the robbery into artificially discrete segments. Evans and Williams were convicted of robbery under R.C. 2911.02(A)(2), which prohibits inflicting, attempting to inflict, or threatening to inflict physical harm on another while committing or fleeing immediately after a theft offense. The underlying theft was not complete on Crosby's opening the inventory-room door. It was complete when the defendants obtained possession of the phones they intended to steal. Ordering the store manager to bag the phones was part and parcel of the act of taking those phones. A robbery does not end the moment a perpetrator locates the goods; it ends when the perpetrator has accomplished the taking. The continued restraint of Crosby while the phones were being collected was thus intrinsic to the robbery itself.

{¶ 54} The State contends that ordering Crosby to bag the phones went beyond what was necessary to complete the taking, because the defendants were perfectly capable of doing that themselves. Evans, after all, was independently filling his own trash bag. On this theory, forcing the victim to participate in the robbery as a laborer demonstrates a significance independent of the theft. We are not persuaded. Ordering a

victim to assist in the taking is still an act directed at accomplishing the taking. It is analogous to a bank robber who orders a teller to hand over the cash from the drawer. The teller's continued restraint while filling the bag with money is intrinsic to the robbery, not a separate kidnapping, even though the robber could in theory have reached across the counter and grabbed the money himself. What matters under *Logan* is the *purpose* of the restraint, that is, was Crosby kept in the room for some reason independent of the robbery, or to facilitate the robbery? The answer is that Strattman ordered Crosby to bag the phones for the same reason he ordered Crosby to the inventory room in the first place—to expedite the taking of those phones. When Crosby put the wrong phones in the bag, Strattman's anger was directed at the perceived failure to complete the taking to his satisfaction. The entire interaction was oriented toward the single objective of obtaining the stolen merchandise. That the perpetrators enlisted the victim's labor in accomplishing that objective does not transform the restraint into something independent of the theft.

{¶ 55} The cases on which the State primarily relies confirm this conclusion, because they involved restraint that continued after the robbery was over. In *Killingsworth*, the Third District declined to merge kidnapping and robbery where, critically, "[t]he robbery was over as soon as Killingsworth gained possession of Daniel's wallet and cell phone," yet the defendant continued to hold the victim at gunpoint for several additional minutes while attempting to unlock the victim's phone. *Killingsworth*, 2020-Ohio-724, at ¶ 18 (3rd Dist.). The temporal separation was key. The taking was complete, yet the restraint continued for a distinctly separate purpose. Similarly, in *State v. Gilcrease*, 2019-Ohio-350, ¶ 19 (8th Dist.), the Eighth District found separate animus where the accomplice continued to hold the victim at gunpoint after the robbery had been completed. In both cases, the restraint extended beyond the completion of the robbery. That is not

what happened here. In this case, the restraint and the robbery ended at the same time. As soon as the phones were collected, the perpetrators departed and Crosby was free to go.

{¶ 56} The facts here are far closer to those in *State v. Anderson*, 2012-Ohio-3347 (1st Dist.), where the First District merged aggravated robbery and kidnapping in a bank-robbery case. In *Anderson*, the victim was moved a short distance and briefly restrained while the perpetrators obtained the bank's property. The court found it "beyond cavil that the bank robbery was the immediate motive for the kidnapping" and that the kidnapping "was merely incidental to the robbery." *Id.* at ¶ 31-32. As in *Anderson*, the restraint here was brief, its purpose was to facilitate the taking, and it ceased when the taking was accomplished.

{¶ 57} We note that the Ohio Supreme Court has long recognized that kidnapping and robbery are allied offenses of similar import. In *State v. Winn*, 2009-Ohio-1059, ¶ 25, the Court held that "the crime of kidnapping, defined by R.C. 2905.01(A)(2), and the crime of aggravated robbery, defined by R.C. 2911.01(A)(1), are allied offenses of similar import pursuant to R.C. 2941.25." We acknowledge that *Winn* was decided under the pre-*Ruff* abstract-comparison framework and that the State in that case did not contest the court of appeals' determination on separate animus, so the Supreme Court had no occasion to conduct a *Logan*-style factual analysis. *See Winn* at ¶ 10. We therefore do not rely on *Winn* for the proposition that the facts there compel merger here. But *Winn* reinforces the broader principle that kidnapping is inherent in virtually every robbery, and that separate punishment is warranted only where the facts establish a genuinely independent basis for the restraint. Nothing in the record here establishes such an independent basis. In *State v. Watson*, 2015-Ohio-2321 (12th Dist.), we recognized the allied-offense

relationship between aggravated robbery and kidnapping while declining to merge the offenses on facts far more egregious than those here, where the victim was restrained for over an hour and beaten repeatedly. *Id.* at ¶ 36.

**b. The Movement Was Not "Substantial" Within the Meaning of *Logan***

{¶ 58} We turn next to the State's argument that Crosby's movement through several rooms qualifies as "substantial" movement under *Logan*. It is true that Crosby traversed a cubby area, a "quote room," and an employee area to reach the inventory room. That is more than a single step. But the *Logan* framework does not measure "substantial" movement by physical distance alone. The relevant question is whether the movement was "substantial so as to demonstrate a significance independent of the other offense." *Logan*, 60 Ohio St.2d at syllabus. The inquiry is qualitative. A long walk that serves no purpose other than facilitating the crime does not establish separate animus; a short distance traveled for a purpose independent of the crime may. The question is always whether the movement has a significance independent of the underlying offense. The "primary question" is "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense" (Cleaned up.) *See Killingsworth*, 2020-Ohio-724, at ¶ 17 (3rd Dist.) .

{¶ 59} Here, every step of Crosby's movement through the store was directed at the single purpose of reaching the inventory room where the phones were kept. Strattman did not order Crosby to the back of the store to secrete him from view, to transport him to a secondary location, or to accomplish anything apart from the theft. The movement was, in the most literal sense, instrumental to the robbery. It was how the perpetrators accessed the locked room containing the merchandise they intended to steal. However

many rooms Crosby passed through along the way, the movement served no purpose independent of the robbery. As Evans aptly put it in his brief, if the defendants could have accessed the phones without moving Crosby, they would have done so. Crosby "was only a means to that end."

### c. No Substantial Increase in the Risk of Harm

{¶ 60} Nor are we persuaded that Crosby was subjected to a substantial increase in the risk of harm separate and apart from that involved in the robbery. The *Logan* framework requires more than simply the risk of violence that any robbery victim faces. It requires that the movement or restraint itself create an additional, independently significant risk. *See Logan* at 135 (providing the example of a victim locked in a bank vault, which would "place[] [the victim] in substantial danger" beyond that inherent in the robbery).

{¶ 61} Here, the State points to the fact that Crosby was isolated from other employees and that Strattman displayed anger during the event. But the robbery itself necessarily involved the threat of force. The entire episode, from the moment the perpetrators entered the store to the moment they left, was a confrontation in which Crosby faced the risk of violence. Moving him to the room where the phones were located did not create a new, independently significant category of danger. It was merely how the robbery was accomplished.

### d. Conclusion on the Kidnapping-Robbery Merger

{¶ 62} The record reflects a single, continuous course of criminal conduct. The restraint or movement of Crosby was motivated by the same immediate purpose as the robbery—to obtain the phones. The detention was brief, it served no purpose independent of the taking, and it ceased the moment the robbery was accomplished. We hold that the

kidnapping and robbery offenses are allied offenses of similar import that should have merged for purposes of sentencing.

### 3. The Possession-of-Criminal-Tools and Robbery Offenses Were Committed Separately and Do Not Merge

{¶ 63} We reach a different conclusion with respect to the possession of criminal tools.

{¶ 64} As a threshold matter, neither Evans nor Williams argued below that the possession of criminal tools and robbery were allied offenses of similar import. Evans raised only the kidnapping-robbery merger at sentencing. Williams likewise argued only for merger of the kidnapping and robbery counts. The failure to raise an allied-offense argument in the trial court "forfeits all but plain error, and a forfeited error is not reversible unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, 2015-Ohio-2459, ¶ 3. Under that standard, the appellants bear the burden of demonstrating "a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus." *Id.*

{¶ 65} We additionally note that Williams's brief, while asserting that the possession of criminal tools should have merged with the robbery, provides no developed analysis of the issue. App.R. 16(A)(7) requires an appellant's brief to include an argument supported by citations to legal authority and facts in the record. Under App.R. 12(A)(2), we "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." *See State v. Philpot*, 2024-Ohio-2596, ¶ 32 (12th Dist.). Williams's conclusory assertion that the

- 23 -

offenses should merge, without more, would alone justify declining to address the argument. Nevertheless, because Evans does offer a developed argument and the issue is substantively identical, we address it on the merits under the plain-error standard.

{¶ 66} Evans contends that the trash bags used to carry the phones out of the store were integral to the robbery and therefore that the possession of those tools and the robbery constituted the same conduct. He relies principally on *State v. Clay*, 2011-Ohio-5086 (12th Dist.), in which we found that a defendant's conviction for robbery and possession of criminal tools merged where the criminal tool was a demand note used to threaten force against a bank teller, and the same note formed the basis of both the robbery and the criminal-tools convictions. *Id.* at ¶ 22-24.

{¶ 67} *Clay* does not control this case because there is a functional distinction between the criminal tool in *Clay* and those in this case. In *Clay*, the criminal tool was the very instrument of force that accomplished the robbery. The demand note was both the means of threatening the teller and the criminal tool. Presenting the note to the teller was a single act that simultaneously constituted both offenses. It was the act of threat that made the taking a robbery and the criminal use of the tool were one and the same. *Id.* at ¶ 23-24. Here, by contrast, the criminal tools at issue performed an entirely different function. The trash bags were used to carry away the proceeds of the robbery. The gloves and masks were used to conceal the perpetrators' identities. None of these items was the instrument of force or threat that constituted the robbery. The robbery was accomplished through Strattman's verbal threats and implied display of weapons, not through the trash bags, gloves, or masks. The tools in this case facilitated the robbery at the margins but were never deployed as the means of committing it.

{¶ 68} The temporal aspect of this case also supports finding separate offenses.

The evidence established that the defendants arrived at the Verizon store already in possession of the trash bags, gloves, and masks, having assembled these items in advance for the purpose of committing the robbery. The possession of these items with criminal purpose was complete before Evans and Strattman ever walked through the door. The robbery, by contrast, began when Strattman confronted Crosby and threatened force. But if temporal separation were the sole test, a criminal-tools conviction could never merge with the underlying offense in any premeditated crime, because the defendant will always possess the tools before committing the planned offense. That cannot be the rule. The *Clay* defendant also possessed his demand note before he entered the bank, yet we held that the offenses merged. The reason we did so is that, in *Clay*, the act of possessing the note and the act of using it to threaten the teller were effectively simultaneous and functionally identical. Presenting the note was a single act that constituted both offenses. Here, by contrast, the tools served a supporting function (carrying phones, concealing identity) rather than being the instrumentality of the robbery itself. The offenses are thus distinct, and under *Ruff*, offenses committed separately do not merge.

{¶ 69} Evans argues that the trash bags were "essential" in enabling the perpetrators to steal 38 phones valued at over $31,000, thereby elevating the merged theft offense to a fourth-degree felony. But, as the State correctly observes, the value of the property stolen is irrelevant to the degree of the robbery offense. *See* R.C. 2911.02(A)(2), (B). The robbery conviction stands on the threat of force, not the amount taken. And while the bags may have been useful in carrying the phones, that usefulness does not make the prior act of possessing them the "same conduct" as the robbery itself.

{¶ 70} Evans and Williams have not demonstrated a reasonable probability that the possession of criminal tools and robbery were committed with the same conduct and

without a separate animus. There is no plain error.

## 4. Conclusion on the Second Assignment of Error and Williams's Single Assignment of Error

{¶ 71} The trial court erred in failing to merge the kidnapping and robbery offenses for purposes of sentencing. But the court did not err in declining to merge the possession of criminal tools with the robbery. Evans's second assignment of error and Williams's single assignment of error are sustained in part and overruled in part.

## C. Postrelease Control

{¶ 72} Evans's third assignment of error alleges:

THE TRIAL COURT FAILED TO ADVISE EVANS OF THE TERM OF PRC OR ITS CONDITIONS AT SENTENCING.

{¶ 73} Evans's third assignment of error contends that the trial court failed to advise him at the sentencing hearing of the term of postrelease control or its attendant conditions, as required by R.C. 2929.19(B)(2)(d) and (f). The State concedes the error. We agree that the trial court's failure to provide the required oral advisements renders the postrelease-control portion of Evans's sentence contrary to law.

## 1. Standard of Review

{¶ 74} We review Evans's sentence under R.C. 2953.08(G)(2). Under that provision, an appellate court may vacate or modify a felony sentence only if it clearly and convincingly finds either that the record does not support the sentencing court's findings under the applicable statutory provisions, or that the sentence is otherwise contrary to law. *State v. Marcum*, 2016-Ohio-1002, ¶ 22-23.

## 2. The Statutory Framework for Postrelease-Control Notification

{¶ 75} Ohio's sentencing statutes impose specific notification obligations on a trial court at a sentencing hearing. For an offender sentenced to a prison term for a second-

degree felony that is not a felony sex offense, postrelease control is mandatory for a period of up to three years, but not less than eighteen months. R.C. 2967.28(B)(3). At the sentencing hearing, the trial court must notify the offender that he "will be supervised" under R.C. 2967.28 after release from prison. R.C. 2929.19(B)(2)(d). The court must also notify the offender that if he violates a condition of postrelease control, "the parole board may impose a prison term, as part of the sentence, of up to one-half of the definite prison term originally imposed upon the offender as the offender's stated prison term or up to one-half of the minimum prison term originally imposed upon the offender as part of the offender's stated non-life felony indefinite prison term." R.C. 2929.19(B)(2)(f).

{¶ 76} The Ohio Supreme Court synthesized these requirements in its analysis in *State v. Grimes*, 2017-Ohio-2927: "(1) whether postrelease control is discretionary or mandatory, (2) the duration of the postrelease-control period, and (3) a statement to the effect that the Adult Parole Authority ('APA') will administer the postrelease control pursuant to R.C. 2967.28 and that any violation by the offender of the conditions of postrelease control will subject the offender to the consequences set forth in that statute." *Grimes* at ¶ 1. Once these advisements are given orally, they must also be incorporated into the sentencing entry. *Id*. It is settled that "a trial court has a statutory duty to provide notice of post-release control at the sentencing hearing" and that "any sentence imposed without such notification is contrary to law." (Cleaned up.) *State v. Holycross*, 2022-Ohio-2312, ¶ 4 (2d Dist.).

### 3. Analysis

{¶ 77} Here, the record is unambiguous. The trial court's sentencing entry contains all three required advisements in writing. The problem is that none of these advisements were delivered orally at the sentencing hearing. The trial court said nothing at the hearing

about whether postrelease control is mandatory or discretionary, the duration of the postrelease-control period, or the consequences Evans would face for violating its conditions.

{¶ 78} R.C. 2929.19(B)(2)(d) and (f) require notification at the sentencing hearing. The failure to discuss postrelease-control advisements orally at the sentencing hearing as required renders the postrelease-control portion of the sentence contrary to law. The State rightly concedes this point. The trial court's complete failure to provide oral postrelease-control notification at the sentencing hearing constitutes an error of law.

### 4. Nature of the Error and Remedy

{¶ 79} The Ohio Supreme Court has made clear that a sentencing court's failure to properly impose postrelease control renders the judgment voidable, not void. *State v. Harper*, 2020-Ohio-2913, ¶ 4. As the Court explained, "[w]hen a case is within a court's subject-matter jurisdiction and the accused is properly before the court, any error in the exercise of that jurisdiction in imposing postrelease control renders the court's judgment voidable, permitting the sentence to be set aside if the error has been successfully challenged on direct appeal." *Id*.

{¶ 80} We sustain Evans's third assignment of error. As for the remedy, where the only sentencing defect is the failure to provide oral postrelease-control notification, the appropriate course is to reverse the trial court's judgment with respect to its imposition of postrelease control and remand for the limited purpose of conducting a hearing at which the trial court properly advises Evans of postrelease control in accordance with R.C. 2929.19(B)(2)(d) and (f). *See Holycross*, 2022-Ohio-2312, at ¶ 7.

### D. Consecutive Sentences

{¶ 81} Evans's fourth assignment of error alleges:

THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE ALL OF THE REQUIRED FINDINGS WHEN IT IMPOSED CONSECUTIVE SENTENCES.

{¶ 82} Evans contends in his fourth assignment of error that the trial court failed to make all the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences. Specifically, he argues that while the trial court orally stated the first two findings at the sentencing hearing, it never made the third required finding under R.C. 2929.14(C)(4)(a), (b), or (c). The State responds that the trial court's statement at sentencing that it had "taken into consideration his record as well" was sufficient to satisfy the criminal-history finding under R.C. 2929.14(C)(4)(c).

**1. The Consecutive-Sentencing Framework**

{¶ 83} R.C. 2929.14(C)(4) provides that a trial court may require an offender to serve multiple prison terms consecutively only "if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following." The statute then enumerates three alternative findings in divisions (a), (b), and (c). As relevant here, division (c) requires a finding that "[t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

{¶ 84} We have described the statutory framework as requiring a "three-step analysis." *State v. Hubbard*, 2015-Ohio-646, ¶ 56 (12th Dist.). First, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. Second, the court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the

offender poses to the public. Third, the court must find that at least one of the factors enumerated in R.C. 2929.14(C)(4)(a) through (c) applies. *Id.* All three steps must be completed before consecutive sentences may lawfully be imposed.

{¶ 85} The Ohio Supreme Court has made clear that a trial court "is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *State v. Bonnell*, 2014-Ohio-3177, at syllabus. Although a "word-for-word recitation of the language of the statute is not required," the reviewing court must be able to "discern that the trial court engaged in the correct analysis." *Id.* at ¶ 29. Where a trial court fails to make all required findings, "the imposition of consecutive sentences . . . is contrary to law" and the sentence must be vacated and the matter remanded for resentencing. *Id.* at ¶ 25.

### 2. Standard of Review

{¶ 86} Before turning to the merits, we must identify the precise standard of review applicable to this assignment of error, because the parties appear to talk past each other on this point. The State frames the question as whether Evans has demonstrated "by clear and convincing evidence that the trial court's imposition of consecutive sentences is contrary to law," and seems to suggest that the R.C. 2953.08(G)(2)(a) standard governs, under which we would review the record to determine whether it "clearly and convincingly" fails to support the trial court's findings.

{¶ 87} But that framing misapprehends the nature of Evans's argument. Evans does not challenge the sufficiency of the record to support a criminal-history finding under R.C. 2929.14(C)(4)(c). He does not ask us to weigh the evidence regarding his criminal history and determine whether it clearly and convincingly fails to support such a finding. Rather, Evans contends that no such finding was ever made at all.

{¶ 88} When a trial court fails to make the required findings, the sentence is "contrary to law" under R.C. 2953.08(G)(2)(b). *See Bonnell*, 2014-Ohio-3177, at ¶ 37. A sentence is "contrary to law" when it is "in violation of statute or legal regulations at a given time." (Cleaned up.) *State v. Bryant*, 2022-Ohio-1878, ¶ 22. Because R.C. 2929.14(C)(4) mandates that specific findings be made as a prerequisite to imposing consecutive sentences, the failure to make those findings renders the sentence contrary to law as a matter of statutory compliance. We review that legal question accordingly.

### 3. The Trial Court's Statements at the Sentencing Hearing

{¶ 89} There is no dispute that the trial court made the first two of the three required findings at the sentencing hearing. The court stated that "consecutive sentences are necessary in order to punish the offender and protect the public from future crime" and that "they're not disproportionate to the conduct or danger posed by the defendant." Those statements adequately track the first and second findings required by R.C. 2929.14(C)(4). The dispute concerns only the third step.

{¶ 90} It is equally undisputed that the sentencing entry contains findings under both R.C. 2929.14(C)(4)(b) (course of conduct) and R.C. 2929.14(C)(4)(c) (criminal history). Evans concedes as much. But as *Bonnell* instructs, the findings must be made at the sentencing hearing, not merely recited for the first time in the journal entry. Thus, the question is whether the trial court's oral statements at the sentencing hearing can be understood to encompass a finding under any of the three alternatives in R.C. 2929.14(C)(4)(a), (b), or (c).

{¶ 91} We can dispose of divisions (a) and (b) quickly. The trial court made no mention of Evans committing offenses while awaiting trial, under sanction, or on postrelease control, so division (a) was not implicated. Nor did the trial court engage in

any discussion of courses of conduct at the sentencing hearing. The sentencing entry's course-of-conduct finding under division (b) appeared there for the first time. It therefore cannot sustain the consecutive sentence.

### 4. The Criminal-History Statement

{¶ 92} The real contest, then, is over division (c) and the trial court's remark that it had "taken into consideration his record as well." The State contends that this statement, considered alongside Evans's extensive criminal history of juvenile robbery offenses, adult convictions for attempted robbery, theft-related offenses, drug trafficking, and multiple prison terms, satisfies the statutory requirement. We are not convinced.

{¶ 93} The problem is not the state of the record regarding Evans's criminal history. The record is replete with information about Evans's past. The problem is that the trial court's passing reference to Evans's "record" was not made in connection with the consecutive-sentencing determination. Context is important. A review of the sentencing hearing reveals that the trial court referred to Evans's record in the course of determining that community control was not appropriate and that a prison term was necessary. That is a distinct sentencing determination governed by different statutory provisions. *See* R.C. 2929.13.

{¶ 94} That the trial court considered Evans's criminal history for one purpose does not mean it necessarily considered that history for a different purpose. A sentencing hearing involves multiple, analytically separate decisions. The determination that a prison term, rather than community control, is warranted is one decision. The decision to impose consecutive rather than concurrent terms is another. Each decision is governed by its own statutory criteria, and R.C. 2929.14(C)(4) requires findings specifically directed at the question of consecutive service. To hold otherwise would be to presume that a general

reference to an offender's record, made for any sentencing purpose, automatically satisfies a specific statutory finding directed at a separate sentencing question.

{¶ 95} The Ohio Supreme Court has emphasized that while the sentencing court need not utter "talismanic" words, the reviewing court must be able to "discern that the trial court engaged in the correct analysis." *Bonnell*, 2014-Ohio-3177, at ¶ 29, 37. *Discern* is the operative word. We must be able to identify from the record that the trial court actually undertook the required analysis, not merely speculate that it might have done so. Here, the trial court's lone reference to Evans's "record" appeared in the context of a community-control-versus-prison analysis, not in the context of explaining why consecutive terms were warranted. The record leaves us to guess whether the trial court took Evans's criminal history into consideration in deciding that consecutive sentences, specifically, were appropriate. That guesswork is precisely what *Bonnell* forecloses.

{¶ 96} We note the contrast with cases in which the third finding has been sustained. In *Hubbard*, for example, the trial court explicitly stated at the sentencing hearing that the defendant's "criminal history and conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." *Hubbard*, 2015-Ohio-646, at ¶ 58 (12th Dist.). The trial court there left no ambiguity. It expressly linked the offender's criminal history to the specific determination that consecutive sentences were necessary. Similarly, in *State v. Ahlers*, 2016-Ohio-2890, ¶ 12 (12th Dist.), we upheld consecutive sentences where the trial court made each of the required findings on the record in connection with its consecutive-sentencing analysis. In each of those cases, we could *discern* the required analysis without inference or speculation.

{¶ 97} Here, by contrast, the trial court's reference to Evans's record was

untethered to any discussion of consecutive sentencing. The court spoke of Evans's criminal history in the same breath as its determination that a prison term was warranted, then pivoted to the consecutive-sentence findings, articulating the first two statutory requirements but never completing the third. We will not fill the gap by assuming that a remark made in one context was intended to serve double duty in another.

{¶ 98} If we were to accept the State's position—that any mention of an offender's record at any point during sentencing automatically satisfies the third required finding— the statutory requirement would be effectively read out of the law. A trial court always considers an offender's record when imposing sentence. The R.C. 2929.14(C)(4) framework requires a finding that the offender's criminal history *demonstrates that consecutive sentences are necessary to protect the public*. That connection must be discernible.

### 5. Consecutive-Sentences Conclusion

{¶ 99} Because the trial court failed to make the third required finding under R.C. 2929.14(C)(4)(a), (b), or (c) at the sentencing hearing, the imposition of consecutive sentences is contrary to law. *See Bonnell*, 2014-Ohio-3177, at ¶ 37. Evans's fourth assignment of error is sustained.

### III. Conclusion

{¶ 100} We have overruled Evans's first assignment of error. We have sustained in part and overruled in part Evans's second assignment of error and Williams's single assignment of error, as the kidnapping and robbery offenses are allied offenses of similar import that should have merged for purposes of sentencing. We have sustained Evans's third assignment of error because the trial court failed to provide the required oral notification of postrelease control at the sentencing hearing. And we have sustained

Evans's fourth assignment of error because the trial court failed to make the necessary findings under R.C. 2929.14(C)(4) at the sentencing hearing before imposing consecutive sentences.

{¶ 101}  The two judgments of the trial court before us are therefore affirmed as to the underlying convictions but reversed as to sentencing. These cases are remanded to the trial court for resentencing consistent with this opinion.

HENDRICKSON, P.J., and SIEBERT, J., concur.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgments or final orders appealed from be, and the same hereby are, reversed as to sentencing only and these causes are remanded for the limited purpose of resentencing according to law and consistent with the above Opinion. In all other respects, the judgments appealed from are affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 25% to Appellant Evans and 75% to appellee in Case No. CA2025-07-058.

Costs to be taxed 50% to Appellant Williams and 50% to appellee in Case No. CA2025-08-068.

*/s/ Robert A. Hendrickson, Presiding Judge*

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*